## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | |
|---|---|
| **ESTATE OF BRIANNA MARIE GRIER,** | ) |
| **by and through her Administrator MARY GRIER,** | ) |
| **and Minor child MARIA MALINA GRIER, and** | ) |
| **Minor child MARIAH SELENE GRIER** | ) |
| **via Guardian Ad Litem Hoganne Harrison-Walton** | ) |
| | ) |
| **Plaintiffs,** | ) CIVIL ACTION |
| | ) FILE NO. |
| **v.** | ) |
| **LIEUTENANT MARLIN PRIMUS** | ) |
| **individually and in his official capacity** | ) |
| **DEPUTY TIMOTHY LEGETTE** | ) |
| **individually and in his official capacity** | ) |
| | ) |
| **SHERIFF TOMLYN PRIMUS** | ) |
| **individually and in his official capacity** | ) **Jury Trial** |
| | ) **Demanded** |
| | ) |
| **Defendants** | ) |
| | ) |

## COMPLAINT FOR DAMAGES

Plaintiff MARY GRIER, as Administrator of the Estate of BRIANNA

GRIER, deceased, and Hoganne Harrison-Walton, as Guardian ad litem of

BRIANNA GRIER'S twin minor daughters respectfully allege:

### Preliminary Statement      1.

This is a civil action pursuant to 42 U.S.C. § 1983 to redress deprivations

under color of law of Brianna Grier's clearly established civil rights secured by the

Fourth, Eighth, and Fourteenth Amendments to the United States Constitution and

pursuant to Georgia's Wrongful Death Act, O.C.G.A. § 51-4-2, which establishes a claim for "the full value of the life of the decedent.".  Claims are hereby filed pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for civil rights violations, unreasonable use of force, deliberate indifference, substantive due process violations, *Monell* unconstitutional customs, policies, and or practices violations, and *Canton* for failure to supervise and discipline, and pursuant to 42 U.S.C. § 12101, for violations of the Americans with Disability Act and Rehabilitation Act.

Plaintiffs also raise, as shown below, state law claims.

## Jurisdiction, Venue and Causes of Action

2.

This Court has original subject matter jurisdiction of the federal questions presented herein pursuant to 28 U.S.C. §§ 1331 and 1343.  This Court also has jurisdiction pursuant to the provisions 42 U.S.C. 1983 and 42 U.S.C. § 1988, Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12131, et seq., and by the laws of the State of Georgia, pursuant to 28 U.S.C. § 1367(a), because the state and federal claims "derive from a common nucleus of operative fact." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966).

3.

Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because all incidents and or occurrences giving rise to this action occurred in this District,

Plaintiffs reside in this judicial District, some or all of the Defendants reside in this judicial district, and the events or omissions giving rise to these claims arose here.

4.

Defendants violated the constitutional rights of Brianna Grier, deceased daughter and mother of the Plaintiffs, under the United States Constitution and the laws of the State of Georgia when they unlawfully and willfully seized and restrained the decedent, falsely arrested the decedent, unnecessarily handcuffed the decedent, picked her up and dropped her multiple times, ignored her cries for help and deprived her of medical assistance, caused injury to her head and brain and ultimately caused her death, misrepresented the true facts, and defamed her.

5

Defendants' conduct under color of state law proximately caused the deprivation of Ms. Grier's federally protected rights. At all times mentioned in this Complaint, the Defendants acted jointly and in concert with each other   Each Defendant had the duty and the opportunity to protect the decedent from the unlawful actions of the other Defendants but each Defendant failed and refused to perform such duty, thereby proximately causing the injuries herein complained of.

6.

Jurisdiction supporting a claim for attorney fees and costs is conferred by 42 U.S.C. §§ 1983, 1988, the 4th Amendment to the United States Constitution, The

Americans with Disability Act, Section 504 of the Rehabilitation Act of 1973, and relevant Georgia law.

7.

This action has been brought within 2 years and all public entity notice provisions have been met.

**The Parties**

8.

At all times relevant hereto and until the time of her death on July 21, 2022, decedent Brianna Grier was a citizen of the United States and resided in Sparta, in Hancock County, Georgia.

9.

Mary Grier is Brianna Grier's mother. Mary Grier is a citizen of the United States and resides in Sparta, Hancock County, Georgia.

Mary Grier is the Administrator of the Estate of Brianna Grier.

On December 15, 2022, Hoganne Harrison-Walton was appointed Guardian ad litem of BRIANNA GRIER'S minor twin daughters Maria Malina Grier and Mariah Selene Grier.

A true and correct copy of the Order appointing Hoganne Harrison-Walton, as Guardian ad litem is attached hereto as Exhibit A.

10.

Brianna Grier (sometimes referred to herein as "Ms. Grier" or "Grier") is
survived by next of kin including her children, siblings, and parents.

11.

All of the Defendants receive some form of federal funding.

12.

Sheriff Tomlyn PRIMUS is the elected Sheriff of Hancock County, Georgia,
holding office by virtue of the constitution and laws of the State of Georgia, and
was acting in the course and scope of his employment and under the color of law at
all times relevant and is sued herein in his individual and official capacity for
purposes of his actions and policies and training of law enforcement personnel
under his control and supervision.  Sheriff Tomlyn PRIMUS is the Policy Maker of
for Hancock County Sheriff's Office.

13.

Lieutenant Marlin PRIMUS is employed by the Hancock County Sheriff's
Office, is the older brother of Sheriff Tomlyn PRIMUS, and was acting in the
course and scope of his employment and under the color of law at all times
relevant, and is sued herein in his individual and official capacity for purposes of
his actions and inactions as described below.

14.

Deputy Sheriff Timothy LEGETTE is employed by the Hancock County

Sheriff's Office, and was acting in the course and scope of his employment and

under the color of law at all times relevant and is sued herein in his individual and

official capacity for purposes of his actions and inactions as described below.

**Facts**

15.

On July 15, 2022 soon after midnight, Hancock County Sheriff's Officers

Lieutenant MARLIN PRIMUS and Deputy TIMOTHY LEGETTE (sometimes

referred to hereinafter as "Officers" and or "State Actors") used unreasonable and

ultimately deadly force against Brianna Grier during a "mental health" response,

causing her death.

16.

As shown by the Officers' body worn camera recordings[1], when the Officers

used force against Ms. Grier she was handcuffed, was wearing shorts, a t-shirt, and

no shoes, she weighed 115 lbs., had no weapon and obviously posed no threat to

the safety of the Officers or anyone else, was not fleeing, the scene was secure, and

---

[1] A ten (10) minute body worn camera recording of the incident is hereby
incorporated by reference, as if pleaded more fully herein.  There are two (2) total
videos.  The first ten (10) minutes of the videos can be viewed at the following
link:  https://www.youtube.com/watch?v=SN6v9thsAZU

there was no reason to rush the circumstances rather than call for and or await medical assistance.

17.

Both Hancock County Sheriff's Officers Lieutenant PRIMUS and Deputy LEGETTE knew of Brianna Grier's mental health history as a diagnosed schizophrenic and both knew she was having an acute mental health episode on July 15, 2022, as that is why they were called to the scene.[2]

18.

Ms. Grier was at her parents' house to visit her three-year old twin daughters, over whom her parents had custody and Ms. Grier was allowed to visit.

19.

Ms. Grier herself contacted 911 by phone; Ms. Grier informed the 911 operator she was having an anxiety attack and needed her medications. Ms. Grier's mother also called 911 seeking mental health assistance for her daughter.

---

[2] Hancock County Sheriff's Policy Section 81-1.43: Mentally Ill Persons, provides: An officer will exercise extraordinary care when handling a person who he knows or has reason to believe is mentally ill. Only that force which is necessary to protect the officer, any other person or persons or the mentally ill person will be used. Police action will not be taken against a person thought to be mentally ill unless a criminal act for which such person can be arrested has been committed, or harm result to such a person or others, or the officer is acting pursuant to court order.
Section 81-1.44 Ill or Injured Person:
An officer must care for any ill or injured person who comes to his/her attention. Medical aid must be provided and a detailed report of the incident will be made.

20.

Lieutenant PRIMUS arrived along with his police canine while Ms. Grier was on the phone with 911 asking for medications.

21.

Deputy LEGETTE arrived to the Grier residence at approximately 12:22:59 am, according to 911 computerized records.

22.

Lieutenant PRIMUS later described he observed Grier "trying to talk over everybody" and that Grier's mother asked responding officers to take her daughter to the hospital for mental health treatment.

23.

Neither Lieutenant PRIMUS nor Deputy LEGETTE activated body worn cameras upon arrival.

24.

Lieutenant PRIMUS did not have a body worn camera with him.

25.

Deputy LEGETTE activated his body worn camera after a period of initial contact with Brianna Grier that resulted in Grier sitting on the ground in front of her parents' house with Lieutenant PRIMUS standing over her (affixing a surgical mask on his face), and his police dog barking.

26.

Despite knowledge of Brianna Grier's mental health situation, rather than calling for or connecting Brianna with mental health treatment on July 15, 2022, Lieutenant PRIMUS claimed he could smell alcohol on Brianna Grier, stating he was charging Grier with "public drunk" and placed handcuffs on her.

27.

When later asked if there were other indications Grier had consumed alcohol such as bloodshot eyes, Lieutenant PRIMUS admitted to Georgia Bureau of Investigation officials that he "didn't really look at her eyes".

28.

Lieutenant PRIMUS also ignored Brianna Grier's attempt to be friendly, ignoring Grier after Grier had asked about Grier's former classmate, Lieutenant PRIMUS' daughter.

29.

Deputy LEGETTE later admitted to Georgia Bureau of Investigation (GBI) officials that he did not smell alcohol on Brianna Grier. During multiple parts of LEGETTE's interaction with Grier, Deputy LEGETTE was not wearing a surgical mask and was in close contact with Grier, including close contact with Grier's face.

30.

Brianna Grier adamantly denied consuming alcohol stating "I am not drunk I haven't had anything to drink" [and asked Lieutenant PRIMUS to] "Bring out your breathalyzer".  No breathalyzer was ever administered.

31.

When Brianna Grier's bodily fluids were later tested no alcohol was present in her system.

32.

As to the "public" nature of the "public drunk" charge by Lieutenant PRIMUS, as stated, Brianna Grier was on her parents' private property.

33.

Brianna Grier was unarmed and never attempted any sudden moves, was never aggressive, never attempted to punch, slap, scratch, bite, kick, or cause any type of harm to the officers.  When later asked if Ms. Grier was being "aggressive" Lieutenant PRIMUS responded that Grier was "Just fussin', just fussin'" and being "argumentative".

34.

Lieutenant PRIMUS places handcuffs on Brianna Grier's wrists in front.

35.

When later asked about Hancock County Sheriff's Office Policy on handcuffing persons in front of their bodies Lieutenant PRIMUS tells GBI investigators "If you're going, if you're taking, going to pick up an inmate… handcuff to the front.  You, if you going like, you know, and I'm picking someone up from Milledgeville, from Milledgeville to Sparta, handcuff to the front.  But if you just rock throwing distance, you handcuff to the back"…"There's no special way, you know, in this, but we don't have a policy, any policies to my understanding.  We don't have a policy, but usually, to be on the safe side, you try to handcuff to the front if you goin', like going to Statesboro or somewhere to pick someone up and put leg irons on 'em, if you goin' from Statesboro State…where you're transferring an inmate."  "Well I just…that's my input on it.  Uh, I try to, what I try to do is just try to look at the situation and put the cuffs on 'em safely and get 'em there safely."

36.

Lieutenant PRIMUS later admits to GBI Investigators the manner in which a detainee is to be transported "safely" is not expressly discussed or included within Hancock County Sheriff's Office Policy.[3]

───────────────

[3] Hancock County Sheriff's Policy Section 81-1.49 Transporting Prisoners, states: "An officer will transport or cause to be transported to the county jail or hospital any person arrested and this action will be taken without delay.  When an officer

37.

Lieutenant PRIMUS grabs Grier by the feet and Deputy LEGETTE grabs Brianna Grier under her arms. Grier cries out in distress, "Get off me! Get off me!" Lieutenant PRIMUS and Deputy LEGETTE then lift Grier and walk several steps as Lieutenant PRIMUS tells Grier "Now you are going to get charged".

38.

Lieutenant PRIMUS later admitted to GBI investigators that it is Hancock County Sheriff's Policy that "any time [an officer] puts hands on someone, you charge them with obstruction".

39.

While carrying Grier toward their police cars, Lieutenant PRIMUS and Deputy LEGETTE drop Grier onto the ground, and her head strikes the ground.

40.

Deputy LEGETTE asks Brianna "are you going to walk?" Lieutenant PRIMUS instructs Deputy LEGETTE "Grab her". Grier can be heard crying.

41.

Lieutenant PRIMUS and Deputy LEGETTE pick Grier up again by the arms and feet and walk toward Deputy LEGETTE's police car. Grier again cries out

---

transports an unaccompanied juvenile, or female, the officer must notify the radio operator of the nature of the transport, time, and mileage of the transporting vehicle at the beginning and completion of the transport."

"Get off me!" and states "I ain't broke no law." Lieutenant PRIMUS and Deputy LEGETTE again drop Grier onto the ground.

42.

Lieutenant PRIMUS opens the driver's side backdoor of Deputy LEGETTE's patrol vehicle. Grier can be heard sobbing and crying. Grier then states "I bet you I hang myself as soon as I get in there". "I don't care. There's more than one way to kill yourself. Y'all better knock me out and I have a stent in my heart." Deputy LEGETTE says "come on Brianna". Grier responds "No. where is my brother".

43.

During this time period Lieutenant PRIMUS walks behind Deputy LEGETTE's patrol vehicle to the passenger side of Deputy LEGETTE's patrol car and opens the passenger side back car door.

44.

Lieutenant PRIMUS returns to the driver's side of Deputy LEGETTE's patrol car, brandishes his Taser device and states "I know how to get her up". Grier states "Tase me. You can Tase me. I don't care". Lieutenant PRIMUS electrifies his Taser device, and it crackles. Lieutenant PRIMUS yells at Grier "Get up". Grier screams out repeatedly "I don't care! I don't care! I don't care!"

Lieutenant PRIMUS states "Ain't nobody going to Tase you" and holsters his Taser device.  Grier perseverates "I don't care" multiple times.

45.

Lieutenant PRIMUS later described to GBI investigators that Grier was in "fear mode" at this point.

46.

Lieutenant PRIMUS then picks Grier up himself and heaves Grier into the back seat of the driver's side of Deputy LEGETTE's patrol car.

47.

Lieutenant PRIMUS does not protect Grier's head while hoisting and heaving Grier into the vehicle.

48.

Grier can be heard audibly exclaiming until her head has crossed the threshold of Deputy LEGETTE's patrol car driver's side back doorframe.

49.

Once Grier's head crosses the car doorframe ceiling, Grier is suddenly silent.

50.

Lieutenant PRIMUS then slams the door shut and Grier does not make another sound the entire duration she is within Deputy LEGETTE's patrol car.

51.

Deputy LEGETTE asks Lieutenant PRIMUS "You got the other side closed?" and PRIMUS responds "Yea". That is false however. The other side (passenger side back door) was never closed by Lieutenant PRIMUS. Lieutenant PRIMUS tells LEGETTE he closed the door at the 2 minute and 44 second mark of the first 10:00 minutes of Deputy LEGETTE's body worn camera footage.

52.

Neither Deputy LEGETTE nor Lieutenant PRIMUS places a seatbelt on Brianna Grier.

53.

When later asked about Hancock County Sheriff's Office Policy on seatbelt use during transportation of detainees Lieutenant PRIMUS informs GBI investigators "We, we, um, we have seat belt 'em. Dependin' on the distance you goin' and like with her, uh, put the seatbelt on, she would'a got out of it, because she handcuffed to the front". "But it depends on the person, or the nature of the crime. We always look at, we always look at who we dealin' with."

54.

Lieutenant PRIMUS admits Grier was not seat belted and states "But we wasn't gonna go that fast, but we was en route with her."

55.

For the next two minutes and six seconds, Deputy LEGETTE and Lieutenant PRIMUS search around their patrol cars for Deputy LEGETTE's blue-tooth phone earpiece device. At the 4 minute and 50 seconds mark, Deputy LEGETTE finds his blue-tooth phone earpiece device.

56.

During this two minutes and six seconds period of time while Deputy LEGETTE and Lieutenant PRIMUS search around their patrol cars for Deputy LEGETTE's blue-tooth phone earpiece device, Grier is completely silent.

57.

Sounds from Grier, be they verbal protestations, exclamatory sounds, sobs, and or crying (all sounds which Grier was making before crossing the patrol car doorframe threshold), would have been audible through Deputy LEGETTE's open front driver's side window and or open back passenger door.

58.

Considering the back passenger door was open while Deputy LEGETTE and Lieutenant PRIMUS searched around their patrol cars for Deputy LEGETTE's blue-tooth phone earpiece device for multiple minutes, had Grier been able to, the sound of her walking away or exiting the patrol car would also have been audible.

59.

At the 4 minute and 55 seconds mark of body worn camera footage, Lieutenant PRIMUS asks Deputy LEGETTE if his dome light will turn on and instructs LEGETTE to turn it on.  Deputy LEGETTE's driver's side front door window is down and Lieutenant PRIMUS shines his flashlight into Deputy LEGETTE's vehicle, toward the open passenger back door.

60.

The instrument panel or "cluster" on the dashboard of Deputy LEGETTE's vehicle is visible in Deputy LEGETTE's body worn camera footage and a car icon with the lower right door ajar symbol is illuminated to indicate the passenger backdoor is open.

61.

Deputy LEGETTE later admits to GBI investigators that he observed Grier slumped on her right side with her head toward the passenger door during this time frame.

62.

Lieutenant PRIMUS later admits to GBI investigators that the reason why he wanted Deputy LEGETTE's dome light on was so that he, Lieutenant PRIMUS, could monitor Brianna Grier for potential suicidal behaviors during the drive to the jail as he followed behind Deputy LEGETTE.

63.

Deputy LEGETTE enters his vehicle at the 5 minute and 2 seconds mark. Deputy LEGETTE gets into the driver's seat of his patrol cruiser without saying a word to Grier, who is soundless.

64.

Deputy LEGETTE radios he is "en route to SO" and states "one female 10-95", which means "Subject in Custody".  Computerized records record the time this occurs as 12:40:49.[4]  Deputy LEGETTE provides his mileage and at the 5:35 mark out 10:00 shifts his vehicle into reverse, and makes a series of turns with his steering wheel.  At the 5:53 mark out of 10:00 Deputy LEGETTE shifts into 'drive', accelerates and turns the steering wheel left two revolutions in rapid succession and then right one revolution.  At exactly 5:58 of 10:00 multiple alarm chimes can be heard.  At exactly 6:18 another chime can be heard when Deputy LEGETTE stops and exits his vehicle.

---

[4] The Officers were at the Grier residence for a total of approximately eighteen (18) minutes (arriving at 12:22:59 and departing at 12:40:49 [which is the time when Deputy LEGETTE radios he is leaving in his patrol car]).  At the time of his departure from the Grier household, Deputy LEGETTE's body worn camera has recorded five (5) minutes and thirty-five (35) seconds, meaning there were no body worn recordings for approximately twelve and one-half (12.5) minutes of the interaction *before* Deputy LEGETTE's body worn camera was activated.

65.

Deputy LEGETTE's body worn camera then shows Brianna Grier outside the patrol car with her face down on the side of the road approximately ten (10) to twelve (12) steps away from Deputy LEGETTE's patrol car.

66.

Lieutenant PRIMUS' vehicle then arrives.


## POST INCIDENT VICTIM BLAMING

67.

Upon arriving, Lieutenant PRIMUS can be heard stating "she jumped out the car" and Deputy LEGETTE responds "Hell yeah".


68.

Lieutenant PRIMUS then states "how your back door open". Deputy LEGETTE states "we're gonna need an ambulance". Lieutenant PRIMUS then states "she jumped out the car".

69.

Deputy LEGETTE radios for an ambulance and Lieutenant PRIMUS then approaches Grier, instructs Grier to "sit up" and moves Grier into a sitting position rather than stabilizing what was surely a brain and spinal cord injury at this

juncture, needlessly risking further injury to Brianna Grier's brain and spinal cord. At the 7 minute and 11 second mark in response to an inquiry from the radio operator asking about the situation, Lieutenant PRIMUS instructs Deputy LEGETTE to respond, "Yea, she jumped out the car."  Deputy LEGETTE then radios "[she] jumped out the vehicle".

70.

Lieutenant PRIMUS instructs Deputy LEGETTE to remove the handcuffs and asks for water.

71.

At the 8 minute and 46 second mark Lieutenant PRIMUS again states "how your back door open.  But that's…We going to write a report that just says, you know, like I said, you got it…that just says back door open.  We gonna trust.. We good.  She fine.  She breathing".

72.

Deputy LEGETTE's body worn camera captures Deputy LEGETTE asking Lieutenant PRIMUS "did you unlock the door".  Lieutenant PRIMUS responds "I might've didn't close it I don't know" and "I don't know if this car door was shut".

73.

Lieutenant PRIMUS then walks away and calls Sheriff PRIMUS.

Lieutenant PRIMUS can be heard reporting to Sheriff PRIMUS that "Brianna

Grier jumped out the car some kind of way".

74.

The audio from Deputy LEGETTE's body worn camera does not record

Lieutenant PRIMUS telling Sheriff PRIMUS that Lieutenant PRIMUS did not

actually see or observe Grier jump, exit, or fall from the vehicle.  The audio from

Deputy LEGETTE's body worn camera does not record Lieutenant PRIMUS

telling Sheriff PRIMUS that Lieutenant PRIMUS arrived after Grier was already

out of the vehicle and lying on the side of the roadway.

75.

After talking with Sheriff PRIMUS on the phone, Lieutenant PRIMUS tells

Deputy LEGETTE "You can cut your camera off".  Deputy LEGETTE does not

seem to hear or understand this command.

76.

Lieutenant PRIMUS then returns to kneel next to Grier and slaps Grier in the

face multiple times and states to Grier "Brianna.  Brianna.  This is Deputy

PRIMUS.  Come on and talk to me now.  You've been getting high every night

now you need to stop that.  We going to try to get you help and take you back to

your mama's house".  Lieutenant PRIMUS then winks at Deputy LEGETTE and leans in close to Brianna and appears to blow air from his lips into her face.

77.

Lieutenant PRIMUS then states "she just bailed out.  I might not have had that door shut.  That I don't know.  That I don't know."

78.

Lieutenant PRIMUS then makes a slashing motion with his hand below his chin, fingers outstretched toward his neck the universal film director's symbol for "cut", and Deputy LEGETTE's body worn camera is then shut off.

79.

Lieutenant PRIMUS later admits to GBI investigators that it his belief that it is Hancock County Sheriff's Policy to turn off a body cam "when things go south".

80.

Lieutenant PRIMUS later admits to GBI when asked about Hancock Sheriff's Office Policy for use of body cameras that "Uh, usually, any time you got a domestic – any domestic, and things you gotta have it. Um, I had just got back from a training, Monday and Tuesday over here at the active shooter class, and I didn't have a chance to get in my, put mine back on."  "But we wear, I wear mine every day".  "I just didn't have it that time, cause we had just came from a training – and I didn't really have a chance.  I've just been really busy, and I didn't have a

chance to put it on, but I always, ninety nine, ninety percent of the time, I have –

my camera, because I do a lot of traffic stop".

81.

When later asked about when deputies are supposed to stop recording,

Lieutenant PRIMUS admits to GBI investigators "It's up to the officer discretion.

I mean, like -  you don't wanna make things seem obvious, like somethin' is fishy,

or somethin' goin' on.  You don't wanna do that."


82.

When later asked about the slashing motion Lieutenant PRIMUS made to

Deputy LEGETTE instructing Deputy LEGETTE to stop recording Lieutenant

PRIMUS told GBI investigators "I told him to cut it off, 'cause, I don't, I just told

him to cut it off, 'cause I said, uh, we was, we was su, we was just talkin', we were

just talkin', and I just told him to go and cut it off, you know, 'cause – things done

happened there, and I don't want nobody thinkin' we, yeah, thank you.  I don't

think we did somethin' to her, but I told him to cut it off.  I told him to cut it off.

Go ahead and cut it off.  He, but we was just talkin'.  I wasn't tryin' to hide

nothin'… - because my adrenaline was pumpin' and I just didn't wanna say

nothin', anything wrong, anything that would incriminate or anything like that".

83.

Despite violation of Hancock County Sheriff's Policy[5] with regard to use of

Body Worn Video/Audio Recording, neither Lieutenant PRIMUS or Deputy

---

[5] Hancock Sheriff's Office Policy Section 06-0009-34-23 - Body Worn
Video/Audio Recording (BWVR), states:
It is **mandatory** that officers use their (BWVR) equipment to record:
1. The actions of suspects during field interviews, when undergoing field sobriety
tests, or when placed in the custody if the recording would prove useful in later
judicial proceedings;
2. The circumstances at crime and accident scenes or other events such as the
confiscation and documentation of evidence or contraband.
3. During officer and complainant/suspect interaction.

Policy: Body Worn Video/Audio recording (BWVR) equipment has been
demonstrated to be of value in the prosecution of traffic violations and related
offenses, in evaluation of officer performance, and for training. In order to
maximize the benefit of this equipment in these and other related areas, officers
will follow the procedures for the use of (BWVR) equipment as set forth in this
policy.

Procedures:
I. Mobile Objective:
A. This department has adopted the use of body worn video/audio recording
systems in order to accomplish several objectives including, but not limited to:
1. Accurate documentation of events, actions, conditions, and statements made
during arrests and critical incidents, so as to enhance officer reports, collection of
evidence and testimony in court;
2. The enhancement of this department's ability to review probable cause for
arrest, arrest procedures, officer and suspect interaction, and evidence for
investigative purposes, as well as for officer evaluation and training.

**06-0009-34-23**
II. Mobile Responsibilities:
A. (BWVR) equipment issued to the deputies is the responsibility of the deputy
assigned to it and will be maintained according to the manufacturer's
recommendations and departmental policy.

LEGETTE faced discipline or repercussion from the Sheriff or from Hancock

County Sheriff's Office.

84.

EMS arrives and Brianna Grier is air-flighted to Grady Hospital.  Grier has

multiple skull fractures upon arrival to the hospital and is declared brain dead.

85.

Six days after the incident, Brianna Grier is dead.

86.

Lieutenant PRIMUS later admits to GBI investigators that he did not see

how Grier exited the vehicle.

---

B. Prior to each shift, officers shall determine whether their (BWVR) equipment is working satisfactorily and shall bring any problems at this or other times to the attention of their immediate supervisor. Notice should be given to the supervisor during regular work hours.

C. Whenever possible during patrol, officers should continually check their equipment for proper operation to ensure that the camera is positioned and adjusted properly, that the (BWVR) is not deactivated until a recorded activity is completed.

III. Use of (10-03-03)
A. The equipment may be manually deactivated during non-enforcement activities such as protecting accident scenes from other vehicular traffic.

IV. Dissemination of Contents of Recorded Information (10-03-06)
A. All Videos will be turn over to the Sheriff or his designee when requested.
B. Videotapes shall not be shown to, copied for, or turned over to defense attorneys, or other persons not involved in the prosecution of a related case without the permission of the prosecuting authority.
C. No Videos or clips will be disseminated to anyone without the SHERIFF'S permission.

87.

Deputy LEGETTE also admits to GBI investigators he did not witness how Grier exited the vehicle.

88.

Despite the fact that Lieutenant PRIMUS did not witness Grier exiting the vehicle, Lieutenant PRIMUS informed Sheriff PRIMUS that Grier "jumped out".

89.

The initial call to 911 from the scene states "[Grier] jumped out the vehicle".

90.

At around 6am, Sheriff PRIMUS falsely informs Marvin and Mary Grier, the parents of Brianna Grier, that Brianna kicked the door open while the vehicle was in motion and jumped out of the moving vehicle.

91.

The GBI investigation of Deputy LEGETTE's patrol car finds no evidence of footprints made by anyone attempting to kick the patrol car's door open.

92.

The GBI investigation finds the back passenger car door was opened by Lieutenant PRIMUS, but was never closed.

93.

During GBI questioning of Lieutenant PRIMUS, Lieutenant PRIMUS refuses to admit he left the door open.  Despite the fact that Lieutenant PRIMUS admitted on the scene that he might not have shut the passenger back door, and that there is video evidence of the door not being closed, Lieutenant PRIMUS adamantly refuses to take responsibility and admit that he did not close the passenger back door.  Given multiple opportunities and confronted with GBI's physical evidence that he did not close the passenger back door, Lieutenant PRIMUS states that if he left the door open, it meant he was trying to hurt Grier.

94.

After the incident, Lieutenant PRIMUS issued an initial report.  The initial report does not detail whether or not Lieutenant PRIMUS closed the passenger backdoor.

95.

The initial report was subsequently altered.  The altered report falsely states:

"I, Lt. Primus, went around to the passenger rear side to attempt to get her into the unit but was unable to reach her.  Then, I closed the rear passenger door and went back around to the driver side rear door and pulled out my taser…"

96.

Lieutenant PRIMUS' initial report was altered at the direction of supervisors at Hancock County Sheriff's Office.

97.

The altered report issued by Lieutenant PRIMUS also states "I asked Deputy Legette what happened.  He stated that she jumped out".

98.

Deputy LEGGETTE also issued a report.  Deputy LEGETTE's report states:

"Brianna Grier refused to get up again after being asked several times by myself.  Lt. Primus then went to the passenger side rear door of my unit and opened the door in an attempt to pull Brianna Grier into the unit, however, Brianna Grier was still on the ground near the driver side rear tire.  Lt. Primus then closed the passenger side rear door and walked back over to me and Brianna Grier."

99.

Deputy LEGETTE's report also states:

"As I began to move forward, I, Deputy Legette, saw a reflection of Brianna Grier moving around in the back seat.  As I turned around to see what Brianna Grier was doing, I hear the passenger side rear door open.  I saw what appeared to be her exiting the unit."

100.

Lieutenant PRIMUS and Deputy LEGETTE falsely arrested Brianna Grier, refused and failed to connect Grier with medical assistance, used unnecessary unreasonable force in handcuffing Grier, picked Grier up and dropped Grier onto her head and on the ground multiple times, threw Grier into a patrol-car without protecting her head which foreseeably injured her, did not seatbelt or secure Grier in the backseat, left the back passenger door open, and then gave Grier a "rough-ride"[6] resulting in Grier's ejection from a moving patrol-car out of the open back passenger door.  Afterwards Lieutenant PRIMUS and Deputy LEGETTE falsely denied that the passenger back door was left open and dishonestly blamed Grier for kicking the door open and jumping out.

101.

Lieutenant PRIMUS later admitted to Georgia Bureau of Investigation officials that he was "ticked off she would not get in the car" and "upset with her", referring to Brianna Grier.

---

[6] A "rough ride" is a police term for "an unsanctioned technique" where the driver of a prisoner transport vehicle "would drive in such a manner that caused injury or pain to the individual in the back of the wagon … A "rough ride" is "a peculiarly cruel means of punishment, as [it] is designed to place the victim in fear for her life. Not only is the prisoner not able to protect herself, but motor vehicles, unlike a controlled or direct applications of force, are not designed for use as a means of securing compliance or otherwise subduing a prisoner." *Thompson v. Commonwealth of Virginia*, 878 F.3d 89, 102-103 (4th Cir. 2017).

102.

Hancock County Sheriff PRIMUS failed to adequately discipline either Lieutenant PRIMUS or Deputy LEGETTE.

103.

When GBI investigators attempted to retrieve body worn camera footage, Hancock County Sheriff's Office Chief Deputy Ricky BROWN physically intimidated said GBI investigators in order to disrupt their investigation.

104.

Hancock County Sheriff PRIMUS allowed this course of conduct and failed to adequately discipline Chief Deputy Ricky BROWN for this conduct.

105.

Subsequent to Brianna Grier's catastrophic injury but before her death, Sheriff PRIMUS falsely informed Grier's parents and news media that Grier had "superhuman strength" and kicked the patrol car door open while the vehicle was in motion.  Sheriff Primus then altered that and claimed Grier picked the lock and jumped out of the moving vehicle.

106.

Sheriff Primus participated in misrepresenting the circumstances and then found no fault, did not discipline, and exonerated his officers of any wrongdoing in the incident that resulted in the catastrophic injury and death of Brianna Grier.

## CLAIMS FOR LIABILITY

### Federal Law Claims

### Count I – General 42 U.S.C. 1983 Claims – against all Defendants

107.

In doing the acts or omissions complained of above, Defendants acted under the color of law to deprive Plaintiff of certain constitutionally protected rights, including, but not limited to:

- The right to be free from unreasonable searches and seizures, as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution;

- The right not to be deprived of life or liberty without due process of law, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution;

- The right to be free from the use of excessive force by state officers and state actors, which is guaranteed by the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

- The right to be free from deprivation of liberty and injury without substantive due process.

- The right to be free from unlawful, reckless, deliberately indifferent, and conscience-shocking deadly and/or excessive force under the United States Constitution and its Amendments.

- The officers' actions here in placing a handcuffed, not seat-belted mentally unstable person in danger of ejection through an open backdoor in a moving vehicle was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."… and… "can properly be characterized as . . . conscience shocking, in a constitutional sense."

## Count II – State Created Danger / Special Relationship 42 U.S.C. 1983 Claims

108.

Federal Courts have held, "If the State places a person in a position of danger and then fails to protect her, it will not be heard to say that the State's role was merely passive; it is as much an active tortfeasor as if it had thrown her into a snake pit".  See *Taylor v. Ledbetter*, 818 F.2d 791, 797 (1987).

109.

A State Actor cannot arrest and handcuff an individual, place them in a dangerous circumstance, and then claim no fault if the person is harmed by precisely the danger created by the State Actors.

110.

A "special relationship" between the Officers and Brianna Grier was created once they responded to her emergency and placed her in handcuffs. This "special relationship" gives rise to a particular duty owed to that individual.

111.

By responding to the call for assistance the Office of the Sheriff made (1) an explicit assurance, through promises or actions, that it would act on behalf of the injured party; (2) the Office of the Sheriff knew that inaction could lead to harm; and (3) Grier and her family justifiably and detrimentally relied on the Office of the Sheriff's affirmative undertaking.

112.

There were (1) affirmative acts by the state that created or increased the risk that Grier would be exposed to harm created by the state itself (2) the state's actions placed the victim specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or clearly should have known that its actions specifically endangered an individual.

113.

The actions and omissions described above constitute a state created danger and/or injury from a special relationship that would not have occurred but for the actions or omissions of the state actors.

114.

As a proximate result of the callous and or reckless actions and omissions described above, Grier was injured, endured physical pain and mental suffering, and was killed.

## Count III - 42 U.S.C. 1983 - EXCESSIVE FORCE

115.

Under the circumstances described above, there was no need for force because Brianna Grier was experiencing a mental health crisis, and therefore any use of force was excessive. Both Lieutenant PRIMUS and Deputy LEGETTE utilized unnecessary excessive force and or failed to intervene to stop said use of force.

116.

Where there is no need for force, any force used is constitutionally unreasonable. There was no *need* for force here.

117.

Not only was the force used unreasonable excessive force but the force utilized was in the community caretaker context- and even less force is authorized in such circumstances.

118.

Force decisions must reasonably consider the Officer's objective for using force; the Officer's reasonable perceptions of the subject's actions or behaviors the officer is attempting to stop, thwart, or control; the foreseeable risks of injuries or harm to the subject resulting from the force to be used and the foreseeable secondary risks of injury.

119.

The Officers did not give appropriate warnings nor reasonably perceive Brianna Grier was capable of complying with demands before deploying the amount of force deployed.  Neither Lieutenant PRIMUS nor Deputy LEGETTE considered all of the above before administering multiple instances of force.

120.

Some use of force appears to have led to Grier being on the ground crying. Considering Grier was unarmed, not a threat, not a flight risk, and that model Police Policy in dealing with emotionally disturbed or people in mental health crisis calls for de-escalation techniques, calming of the circumstances, and urges responding officers not to physically touch emotionally disturbed or people in mental health crisis, but rather to maintain a distance and speak respectfully in order to reassure a person in crisis that they will be safely helped, any force used

that led to Grier being on the ground crying, including verbal intimidation, was unreasonable.

121.

The second use of force involved the application of handcuffs to Brianna Grier.

122.

There was no specific reason for the Officers to believe that Brianna Grier (the detainee) posed a risk of flight or violence to another sufficient to justify the use of handcuffs and even a bare inference or speculation that Brianna Grier might somehow be violent is not sufficient to justify the use of handcuffs.

123.

There were no pre-risk-of-flight indicators nor were there any pre-violence indicators and both Officers knew that Grier was not armed.  Neither Officer had any information or inkling of suspicion Grier was about to commit a violent crime against another.

124.

Grier was outnumbered by the officers and significantly outweighed by the officers.

125.

Grier committed no criminal activity justifying an arrest or handcuffing.

126.

The Officers were called to the Grier residence for a mental health crisis and Grier's parents requested Grier be taken to the hospital.  Lieutenant PRIMUS states, only after Grier was handcuffed, and while he is carrying her to the patrol car, "Now you are going to get charged".

127.

The Georgia Department of Public Safety Policy Number 6.05.3 Procedures states at B. 9. "Do not place restraints on a subject with their hands in front."

128.

There was no crime, and therefore the severity of the crime at issue was non-existent or minimal.  Grier posed no threat to the safety of the officers or others, and was not actively resisting arrest or attempting to evade arrest by flight.  Grier was having a mental health crisis and such was known to the officers.  Grier's verbal protestations and passive resistance did not justify handcuffing her and was therefore unreasonable.

129.

The third use of force involved the action of the Officers picking Grier up from the ground and dropping her onto her head and neck.

130.

Model Police Policy in dealing with emotionally disturbed or people in

mental health crisis calls for de-escalation techniques, calming of the

circumstances, and urges responding officers not to physically touch emotionally

disturbed or people in mental health crisis, but rather to maintain a distance and

speak respectfully in order to reassure a person in crisis that they will be safely

helped.  Grier was not posing a threat to the Officers and was not a flight risk.

Picking up Grier, carrying her by her hands and feet for not instantaneously

complying with the threatening demands of Lieutenant PRIMUS whose police dog

was barking nearby while Grier was experiencing a mental health crisis and then

dropping her on her head and neck constitutes excessive force and a hard fall onto

the ground causing a strike to such a sensitive and vitally important part of Grier's

body was objectively unreasonable.

131.

The fourth use of force involved another instance of the Officers picking

Grier up, carrying her, and then dropping her on her head and neck.

132.

Grier was not posing a threat to the Officers and she was not a flight risk.

Grier required time and sensitivity, not intimidation and being dropped on the hard

ground from the Officers' waist level causing a heavy blow to Grier's head.  To

drop Grier onto the ground constitutes excessive force and a strike to such a

sensitive and vitally important part of Grier's body was objectively unreasonable.

133.

The fifth use of force involved Lieutenant PRIMUS' intimidating Grier with

the Taser device.

134.

Grier was not posing a threat to the Officers and she was not a flight risk.

Lieutenant PRIMUS' display, brandishing, energizing, and crackling of the Taser

device was done in order to intimidate and threaten with it - that alone constitutes

unreasonable force, even on an individual not in a mental health crisis but

especially on one in an emotionally disturbed state.

135.

Lieutenant PRIMUS did not brandish and electrify his Taser because he

feared for his safety or the safety of anyone else at the scene.  A desire to cow a

subject into compliance is not one of the reasons for which the use of weapons is

allowed.

136.

The sixth use of force involved not protecting Grier's head while yanking,

hoisting, heaving and dumping Grier's body into Deputy LEGETTE's vehicle.

137.

Grier posed no threat to the safety of the Officers or others and Grier did not

attempt to flee.

138.

The Georgia Department of Public Safety Policy Number 6.05.3 Procedures

instructs at section D. Transporting Prisoners 1. to "Carefully place the individual

into the patrol car."

139.

Grier was not "Carefully placed" into the vehicle; her head was not

protected while crossing the doorframe threshold into the patrol car and Grier's

head appears to have struck the car doorframe ceiling.  A strike to such a sensitive

and vitally important part of her body, which caused her to become immediately

uncommunicative and soundless was objectively unreasonable.

140.

The seventh use of force involved giving the now-wounded Grier a "Rough

Ride" and ejecting Grier from the vehicle.  The Officers refused to secure or fasten

Grier's seatbelt after her head was injured during entry to the patrol car causing

Grier to be completely mute.  Deputy LEGETTE then drove recklessly causing

Grier to be whiplashed from the backseat driver's side to the passenger's side

backseat and out of the back passenger open door catastrophically injuring Grier

during transport.  Such constitutes excessive force.

141.

No reasonable officer would think that violently jolting a maimed prisoner

around in the backseat of a moving vehicle with no seatbelt while the back door

was open is an acceptable use of force.  The obviousness of the constitutional

violation cannot be overstated as the Officers could not reasonably have believed

that driving recklessly with the backdoor open while a dazed Grier was not

wearing a seatbelt was remotely lawful.

142.

The eighth use of force happened after Grier's body was ejected from the

moving vehicle and Grier lay on the side of the road.  Any reasonable officer

would know not to move a traumatically injured person's head and neck but

instead to stabilize the spinal column and not risk further injury.  Instead,

Lieutenant PRIMUS scooped Grier into a sitting position and Deputy LEGETTE

did nothing to intervene.

143.

The callous and or reckless actions and omissions described above constitute

multiple separate violations of the rights secured to Grier by the Fourth

Amendment to the United States Constitution.

144.

Defendants unlawfully and unreasonably seized Grier by means of excessive physical force and unreasonably restrained Grier of her freedom, and/or Defendants failed to intervene when others unlawfully seized Grier with excessive force.

### Count IV - Violation of Fourth Amendment, *Deliberate Indifference* to <u>Substantial Risk of Injury Against State Actors</u>

145.

Plaintiffs incorporate and reallege all allegations as if set forth fully verbatim herein.

146.

Knowledge of the need for medical care and intentional refusal to provide that care constitutes deliberate indifference.  The Officers were aware that Brianna Grier was experiencing an acute mental health crisis and refused to connect Grier with medical and or psychological care.  Instead, the Officers created a pretext to arrest Grier.

147.

Law enforcement officers such as Lieutenant PRIMUS and Deputy LEGETTE know of the risk of injury of slamming a detainee's head into a patrol car.  This is why it is routine for law enforcement officers to place one of their

hands on a detainee's head to protect the head from striking the patrol car doorframe when assisting a detainee into a patrol car.

148.

Law enforcement officers such as Lieutenant PRIMUS and Deputy LEGETTE also know of the safety risks associated with not wearing seatbelts, as these Officers issue citations to citizens, drivers and passengers, who do not wear their seatbelts while in moving vehicle and have publicly stated that citizens, youths, and children must use seat belts for safety and security.

149.

Law enforcement officers such as Lieutenant PRIMUS and Deputy LEGETTE also know of the dangers of having vehicle doors open while a vehicle is in motion.

150.

Deputy LEGETTE admits he saw Grier slumped in the back seat and Lieutenant PRIMUS shined his flashlight into the backseat toward the passenger side. Deputy LEGETTE's "cluster" / instrument panel illuminated to alert the driver that the back passenger door was open. Deputy LEGETTE's patrol car also made a chime or ding indicating a door was ajar.

151.

Both Officers saw, heard, ignored, and or should have seen that the back passenger door was open before driving with a person in a mental health crisis who was injured, unsecured, un-seat-belted, dazed, muted, and potentially suicidal, or at minimum, a detainee who had verbalized suicidal ideation and plan.

152.

Both Officers knew Grier was not wearing a seatbelt.

153.

Both Officers saw or failed to protect Grier's head upon her entry into the patrol car.

154.

Defendants' failure to protect Grier's head upon entry to the patrol car, failure to secure and properly seat belt Grier during transport, and Defendants' not closing the passenger side back car door or ensuring it was closed prior to driving constitutes callous and or reckless actions and omissions and or deliberate indifference to known risk of substantial injury.

155.

After giving Grier a "Rough Ride" and ejecting Grier from a moving vehicle, moving Grier's body post-injury created substantial risk of further injury.

## Count V - Violation of Fourth Amendment, *Deliberate Indifference* to Medical / Psychological Need Against State Actors

### 156.

Plaintiffs incorporate and reallege all allegations as if set forth fully verbatim herein.

### 157.

Brianna Grier's family requested medical and psychological assistance and Hancock County Sheriff's Officers refused to provide that medical assistance. Instead, the Officers handcuffed and intimidated Brianna Grier, falsely arrested her, used unnecessary excessive force, brutalized and battered her, failed to secure her and placed her in extreme danger that they created, resulting in catastrophic injury and death.   These callous and or reckless actions and omissions constitute deliberate indifference to Brianna Grier's known medical / psychological needs.

## Count VI - Violation of Eighth Amendment, Cruel & Unusual Punishment

### 158.

Plaintiffs incorporate and reallege all allegations as if set forth fully verbatim herein.

### 159.

Brianna Grier had an Eighth Amendment right to be free from unreasonable risks of harm.  The Eighth Amendment prevented the Defendants from exercising

deliberate indifference toward Brianna Grier's safety, security, and constitutional rights.

160.

Insufficient hiring, training, supervision, policies, customs, and or practices related to the handling of detainees and or arrestees, and failure of Defendants to take reasonable measures to prevent the conduct that is complained of herein, constituted a deliberate indifference to the safety, security, and rights of Brianna Grier and exposed Brianna Grier to unreasonable risks of harm.

161.

The recklessness of the Officers, their wrongful acts, indifference, and failures proximately caused serious and horrific injuries, and death to Grier.

**Count VII - *Monell* / Municipal Claims Against Office of the Sheriff & Sheriff Primus for Violation of Fourth Amendment, *Deliberate Indifference* to Substantial Risk of Injury from Unsafe Transport Custom <u>that is Pervasive, Long-Standing Practice</u>**

162.

Plaintiffs incorporate and reallege all allegations as if set forth fully verbatim herein.

163.

Sheriff Primus and Hancock County Sheriff's Office Policy (as detailed in Footnote 1, above), Section 81-1.49 Transporting Prisoners states:

An officer will transport or cause to be transported to the county jail or hospital any person arrested and this action will be taken without delay.  When an officer transports an unaccompanied juvenile, or female, the officer must notify the radio operator of the nature of the transport, time, and mileage of the transporting vehicle at the beginning and completion of the transport.

164.

This is inadequate official policy that contains gaps which have caused officers to violate the constitution resulting in infliction of injury upon Plaintiff. The "gaps" include a failure to address seatbelt use or safe transport.  This Policy is strictly about speed and communication, and it has led to widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law.  It also demonstrates that the Sheriff tacitly authorized and or displays deliberate indifference towards constitutionally offensive actions of its employees in risking substantial injury during transport of detainees.

165.

According to Lieutenant PRIMUS (as detailed in allegations 55 and 56), Hancock County Sheriff's Office Policy on seatbelt use during transportation of detainees "Depend[s] on the distance you goin'" and "it depends on the person, or the nature of the crime.  We always look at, we always look at who we dealin' with."

166.

Lieutenant PRIMUS admits Grier was not seat belted and states "But we wasn't gonna go that fast, but we was en route with her."

167.

Lieutenant PRIMUS is Sheriff Tomlyn PRIMUS' older brother.  Lieutenant PRIMUS is explaining the pervasive, long-standing practice of the Hancock County Sheriff's Office with regard to transportation of detainees.  The written Policy is inadequate and Sheriff PRIMUS has allowed a custom and practice of deliberate indifference to a substantial risk of injury from unsafe transport as Officers are not using seat-belts nor ensuring safe transport which resulted in the catastrophic injury and death of Brianna Grier.

**Count VIII - Violation of the Fourth Amendment, Municipal Liability Under *Monell* Arising from the Defendant Sheriff's Office Deliberate Indifference and Failure to Discipline Officers Who Use Excessive Force – Even When Unlawful Use of Force is Captured on Video and GBI Proves <u>Officers and Sheriff Falsified Reports and Misrepresented Details</u>**

168.

Plaintiffs incorporate and reallege all allegations as if set forth fully verbatim herein.

169.

Defendants have a duty to provide responsible and effective operations of its Sheriff's Office.

170.

Defendants have a duty to establish proper policies, customs, and regulations of the Sheriff's Office with regard to conducting fair and impartial investigations into the use of force involved in every incident in which force is used by officers.

171.

Before Brianna Grier was killed Defendants had a custom and policy of failing to properly supervise and discipline officers in order to eliminate the potential of unjustified and deadly force.

172.

Failing to discipline officers encourages officers to use excessive force.

173.

Even more so, helping officers to deceive by adding false details to the deception ratifies dishonesty and encourages officers to lie and misrepresent.

174.

Lieutenant PRIMUS claimed he could smell alcohol on Brianna Grier yet Deputy LEGETTE admitted he never smelled alcohol emanating from Grier. Deputy LEGETTE carried Grier by the arms and was close to Grier face. Deputy LEGETTE had Grier in his patrol car. Deputy LEGETTE held Grier at the side of the road after she was injured. Deputy LEGETTE never smelled alcohol during

any of these close contacts.  Grier also had no alcohol in her blood system when tested.

175.

Lieutenant PRIMUS was never challenged on his claim that he smelled alcohol on Grier nor was Lieutenant PRIMUS himself tested for his own blood alcohol content.

176.

Lieutenant PRIMUS admitted he did not see how Grier exited the vehicle yet Lieutenant PRIMUS claimed Grier "jumped out".

177.

Deputy LEGETTE participated in and went along with this false narrative knowing it was untrue.

178.

Sheriff PRIMUS aided and abetted Lieutenant PRIMUS in concocting a false narrative about Brianna Grier having "superhuman strength" and kicking the patrol car door open while the vehicle was in motion.

Sheriff Primus then altered that falsehood and invented a new fabrication that claimed Grier picked the lock and jumped out of the moving vehicle.

179.

Lieutenant PRIMUS and Deputy LEGETTE were encouraged by Supervisors including Sheriff PRIMUS and others to falsify official reports and paperwork and mislead GBI investigators as to the true nature of the circumstances involving the closure of the back passenger door.

180.

When GBI investigators attempted to retrieve body worn camera footage from Hancock County Sheriff's Office, Chief Deputy Ricky BROWN physically intimidated said GBI investigators in order to disrupt their investigation.

181.

Hancock County Sheriff PRIMUS allowed and encouraged the above course of conduct by Lieutenant PRIMUS and Deputy LEGETTE and failed to adequately discipline Chief Deputy Ricky BROWN for interfering with the compiling of evidence.

182.

Even after their falsehoods were debunked by GBI, Sheriff PRIMUS allowed his Officers' demonstrably false statements to remain and refuses to withdraw his own false statements or apologize for the misrepresentations he and his Officers have made.

183.

Sheriff PRIMUS' assistance in creating a false narrative and decision not to discipline his brother Lieutenant PRIMUS and Deputy LEGETTE constitutes an official policy of the Hancock County Sheriff's Office that condones excessive force and encourages other officers to use excessive force as a matter of course and to lie in official paperwork and reporting and testimony to justify their unlawful actions.

184.

These failures to correct falsity but instead add to the misrepresentation and deception are failures to supervise and discipline and such ratify arbitrary and capricious leadership and enable the unjustified uses of force in this incident.

185.

These failures to correct falsity but instead add to the misrepresentation are examples of ongoing widespread practice that. is so permanent and well settled as to constitute a custom or usage with the force of law.  It also demonstrates that the Sheriff explicitly authorized and or displays deliberate indifference towards constitutionally offensive actions of its employees in failing to discipline officers who use excessive force, falsify official reports and misrepresent facts to cover up wrongdoing.

186.

The Sheriff's custom and practice of tolerating, encouraging, and condoning misconduct by officers directly and proximately resulted in Grier's death.

**Count IX - Violation of the Fourth Amendment, Municipal Liability Custom / Pattern / Practice / Policy of Trumping Up Obstruction Charges *Monell* Liability Brought pursuant to 42. U.S.C. 1983, <u>Against State Entities and Supervisors</u>**

187.

Plaintiffs incorporate and reallege all allegations as if set forth fully verbatim herein.

188.

As detailed in allegation 38., above, Lieutenant PRIMUS admitted to GBI investigators that it is Hancock County Sheriff's Policy that "any time [an officer] puts hands on someone, you charge them with obstruction".

189.

Lieutenant PRIMUS is Sheriff Tomlyn PRIMUS' older brother.  Lieutenant PRIMUS is explaining the pervasive, long-standing practice of the Hancock County Sheriff's Office with regard to encouraging officers to charge individuals with obstruction even when the officer initiates hands-on contact for no valid purpose or legal reason.

190.

In this instance, even though Model Police Policy urges officers not to physically touch emotionally disturbed persons in mental health crisis but instead to use time as an ally, reassure the person that the officer is there to safely help, and to deescalate with calming techniques and appropriate distance, Lieutenant PRIMUS threatened, intimidated, applied hands-on and handcuffs, and falsely arrested Brianna Grier, and unnecessarily used excessive force causing catastrophic injury and death to Grier.

**Count X - Violation of the Fourth Amendment, Municipal/*Monell* Liability Custom and Policy of Allowing Officers to Selectively Utilize Body Cameras Brought pursuant to 42. U.S.C. 1983, Against State Entities and Supervisors**

191.

Plaintiffs incorporate and reallege all allegations as if set forth fully verbatim herein.

192.

As detailed in Footnote 5,:

Hancock Sheriff's Office Policy Section 06-0009-34-23 **-** Body Worn Video/Audio Recording (BWVR), states:
It is **mandatory** that officers use their (BWVR) equipment to record:
1. The actions of suspects during field interviews, when undergoing field sobriety tests, or when placed in the custody if the recording would prove useful in later judicial proceedings;
2. The circumstances at crime and accident scenes or other events such as the confiscation and documentation of evidence or contraband.
3. During officer and complainant/suspect interaction.

Policy: Body Worn Video/Audio recording (BWVR) equipment has been demonstrated to be of value in the prosecution of traffic violations and related offenses, in evaluation of officer performance, and for training. In order to maximize the benefit of this equipment in these and other related areas, officers will follow the procedures for the use of (BWVR) equipment as set forth in this policy.

Procedures:

I. Mobile Objective:

A. This department has adopted the use of body worn video/audio recording systems in order to accomplish several objectives including, but not limited to:

1. Accurate documentation of events, actions, conditions, and statements made during arrests and critical incidents, so as to enhance officer reports, collection of evidence and testimony in court;

2. The enhancement of this department's ability to review probable cause for arrest, arrest procedures, officer and suspect interaction, and evidence for investigative purposes, as well as for officer evaluation and training.

**06-0009-34-23**

II. Mobile Responsibilities:

A. (BWVR) equipment issued to the deputies is the responsibility of the deputy assigned to it and will be maintained according to the manufacturer's recommendations and departmental policy.

B. Prior to each shift, officers shall determine whether their (BWVR) equipment is working satisfactorily and shall bring any problems at this or other times to the attention of their immediate supervisor. Notice should be given to the supervisor during regular work hours.

C. Whenever possible during patrol, officers should continually check their equipment for proper operation to ensure that the camera is positioned and adjusted properly, that the (BWVR) is not deactivated until a recorded activity is completed.

III. Use of (10-03-03)

A. The equipment may be manually deactivated during non-enforcement activities such as protecting accident scenes from other vehicular traffic.

193.

Despite Hancock Sheriff's Policy mandating use of body worn cameras,

Lieutenant PRIMUS did not have a body worn camera during the incident and

Deputy LEGETTE only activated his body worn camera after Grier was already on the ground crying, failing to record significant interactions for approximately twelve and one-half minutes (12.5).  See footnote 4.

194.

Furthermore, Lieutenant PRIMUS instructs Deputy LEGETTE to turn off his body worn camera after Grier is injured.

195.

Allegation 79., above, details that Lieutenant PRIMUS admits to GBI investigators that it his belief that it is Policy to turn off a body cam "when things go south".

196.

Allegation 81., above details that Lieutenant PRIMUS, when asked when deputies are supposed to stop recording, Lieutenant PRIMUS admits to GBI investigators "It's up to the officer discretion.  I mean, like -  you don't wanna make things seem obvious, like somethin' is fishy, or somethin' goin' on.  You don't wanna do that."

197.

Allegation 82., above details that the slashing motion Lieutenant PRIMUS made to Deputy LEGETTE instructing Deputy LEGETTE to stop recording was

because Lieutenant PRIMUS did not want Deputy LEGETTE's body worn camera to record "anything that would incriminate or anything like that".

198.

Lieutenant PRIMUS is Sheriff Tomlyn PRIMUS' older brother. Lieutenant PRIMUS is explaining the pervasive, long-standing practice of the Hancock County Sheriff's Office with regard to allowing officers to selectively utilize body worn cameras, to turn off the cameras "when things go south" or when an officer seeks to avoid saying "anything that would incriminate".

199.

Hancock County Sheriff's Office Chief Deputy Ricky BROWN verbally demeans and physically intimidates a GBI investigator to avoid providing GBI Deputy LEGETTE's body worn cam footage. And Lieutenant PRIMUS did not bring a body worn camera to the scene and there were no supervisory or disciplinary consequences for failing to do so.

200.

In another use of force situation involving a Hancock County Sheriff's Office Deputy that occurred on December 13, 2018, a 22 year old individual named Dequane Rayshun Williams of Sparta was shot multiple times. The Deputy Sheriff did not activate a body worn camera until well after the multiple shootings, so that the details of the shootings could not be reviewed via video.

201.

There was no disciplinary action taken against the Deputy Sheriff for failure

to abide by Hancock County Sheriff's Body Worn Camera Policy, Section 06-

0009-34-23.

202.

In another use of force situation involving a Hancock County Sheriff's

Office Deputy that occurred on August 31, 2022, a 17 year old individual named

Montavious Lewis of Sparta was shot.  Likewise there, the Deputy Sheriff never

activated a body worn camera and there were no supervisory or disciplinary

consequences.

203.

The Sheriff's Office and Sheriff PRIMUS have been aware of a pattern or

practice of failure to abide by purportedly mandatory Policy to activate body worn

cameras and Sheriff PRIMUS' conscious refusal to enforce this Policy is

tantamount to an official policy of condoning and embracing constitutional

violations.

204.

This deficiency in training and supervision and discipline reflects a

deliberate or conscious choice by the Sheriff to tolerate the selective activation of

body worn cameras which allows officers to utilize excessive force without proper

supervision due to inability to see and observe actual facts, as recorded by video. Moreover, the failure of officers to bring and activate cameras constitutes spoliation of evidence and is at minimum circumstantial evidence of Bad Faith.

205.

The acts complained of herein plainly and indisputably violated official policy and Plaintiffs will prove a pattern or practice of past violations demonstrating either that the de jure policy did not match the de facto one, or that the municipality was deliberately indifferent to an obvious need for additional training to ensure that employees were aware of and understood that policy.

**Count XI – *Canton* Liability for Inadequate Training / Supervision / Discipline Violations of the Fourth Amendment, *Deliberate Indifference* To Medical / Psychological Need and Failure to Train / Supervise / Discipline / <u>or Otherwise Maintain Policy Against State Entities, Supervisors</u>**

**AND**

<u>**Count XII Supervisory Liability Against Sheriff Primus and Lt. Primus**</u>

206.

Plaintiffs incorporate and reallege all allegations as if set forth fully verbatim herein.

207.

Sheriff PRIMUS and the Hancock County Sheriff's Office has inadequate

and insufficient policy for dealing with individuals experiencing mental health

crises.  Lieutenant PRIMUS was the supervisor on the scene.

208.

Footnote 1 contains Hancock County Sheriff's Policy Section 81-1.43:

Mentally Ill Persons, which provides:

An officer will exercise extraordinary care when handling a person who he knows
or has reason to believe is mentally ill.  Only that force which is necessary to
protect the officer, any other person or persons or the mentally ill person will be
used.  Police action will not be taken against a person thought to be mentally ill
unless a criminal act for which such person can be arrested has been committed, or
harm result to such a person or others, or the officer is acting pursuant to court
order.

Section 81-1.44 Ill or Injured Person:
An officer must care for any ill or injured person who comes to his/her attention.
Medical aid must be provided and a detailed report of the incident will be made.
Policy says: "extraordinary care"

209.

Appropriate Policy would incorporate the need for de-escalation, calming

techniques, using time as an ally rather than allowing officers to interpret what

"extraordinary care" means, as some might interpret this to mean it is advisable to

rush and end the circumstances quicker, faster, and with more force than ordinary.

210.

Appropriate Policy would include crisis intervention and suicide prevention and would incorporate scenarios and instances from Federal case law to serve as explanations and warnings for the types of behaviors to look out for and expect. Model Policy and Training action steps, guiding principles, insights, and provisions from organizations such as Department of Justice, Police Executive Research Forum (PERF), International Chiefs of Police (IACP) could and should be incorporated. Instruction to seek advice from behavioral health specialists should also be included as well as essential elements of handling this special population with emphasis on defusing tactics, communication, coordination of resources, containment, elongation of the time of the encounter, all to occur in the field on the scene.

211.

Georgia's General Assembly has found, as stated in the newly enacted "Georgia Behavioral Health and Peace Officer Co-Responder Act" Code Section 37-3-4:

"Demands on peace officers include responding to emergencies involving individuals with a mental or emotional illness, developmental disability, or addictive disease" and "the absence of a behavioral health specialist may result in

the arrest of individuals whose conduct would be more effectively treated and stabilize in a behavioral health setting rather than a jail or prison".

212.

There is an obvious need to appropriately train officers with respect to responding to and or detaining or taking emotionally disturbed persons into custody, and or contacting health professionals to assist with response, and therefore it was deliberately indifferent not to do so.

213.

To falsely criminalize, rough-handle, drop Grier on the ground, intimidate, and place Grier in certain danger is reckless and totally contrary to proper law enforcement practices for dealing with mentally ill or emotionally upset persons.

214.

Rather than acknowledge what truly occurred, the Sheriff himself determined that Grier had "super human strength", "kicked out", and or "picked the lot" and or "jumped out" of the vehicle.

215.

In failing adequately to train and supervise subordinates, the Sheriff was deliberately indifferent to mentally ill detainees' mental health care needs.

216.

A reasonable person in the supervisor's position would know that his failure

to train and supervise reflected deliberate indifference and the Sheriff's own

conduct was causally related to the constitutional infringement by his subordinate.

217.

Sheriff PRIMUS and Lieuteneant PRIMUS are both supervisors who

personally participated in the constitutional violations and there is a causal

connection between the actions of the supervising officials and the alleged

constitutional deprivation.

218.

Hancock County Sheriff's Office and its supervisors knew that state actors

were likely to encounter individuals who experienced episodic mental illness a

significant risk of injury and danger. Hancock County Sheriff's Office either chose

not to train officers on this issue or inadequately trained and/or improperly

supervised Deputy Sheriffs on this issue.

219.

High ranking officials at Hancock County Sheriff's Office (including Sheriff

Primus and Lt. Primus) knew and or reasonably should have known of repeated

acts of excessive force directed at mental illness patients including one Brianna

Grier.

220.

Hancock County Deputy Sheriffs receive very little, if any, training regarding the nature and symptoms of mental illness, or appropriate responses.

221.

The violations of Ms. Grier's rights were proximately caused by, and pursuant to, the policies, customs, usages, and or longstanding patterns and practices of Hancock County Sheriff's Office.

222.

These policies, customs, usages, patterns and practices of Hancock County Sheriff's Office that caused the violations of Ms. Grier's rights include, but are not limited to:

a. Failing to train, supervise, investigate, discipline, and adopt and enforce adequate policies concerning the Fourth Amendment's prohibition on the use of excessive force and unreasonable seizure and/or condoning the use of excessive force;

b. Failing to train, supervise, discipline, and adopt and enforce adequate policies concerning the care of people suffering from mental illness;

c. Failing to train, supervise, investigate, discipline, adopt and enforce adequate policies concerning identification, interactions, and unnecessary restraining of persons suffering from mental illness;

d. Failing to train, supervise, discipline, and adopt and enforce adequate policies concerning mentally ill or unstable persons suffering from schizophrenia, excited delirium and other known causes of preventable deaths among persons experiencing mental abnormalities.

223.

Sheriff Primus has final policymaking authority with respect to the matters enumerated in sub-paragraphs 'a' through 'd' above.

224.

Hancock County Sheriff's Office and Sheriff Primus knew to a moral certainty that its Sheriff's Deputies and officers would come into contact with persons suffering from mental illness such as Brianna Grier, and indeed have come in contact with similarly situated persons, and should be trained in how to deal with such persons without violating their constitutional rights, and have violated such persons' rights.

225.

The policies- be they express, implied, existent or non, longstanding widespread practice, or other custom, usage, pattern, and or practice -of Hancock County Sheriff's Office, and the actions of its state actors, caused Brianna Grier's death, and the damages alleged by the Plaintiffs.

226.

At all relevant times, Hancock County Sheriff's Office knew or should have known that the law enforcement officers of the Hancock County Sheriff's Office would encounter people suffering from mental illness, and would require training so that actors would not violate the rights of those whom they encounter who are suffering from mental illness, but instead could protect such vulnerable people.

227.

Nevertheless, Defendant Sheriff Primus and Lieutenant Primus failed to instruct, train, supervise and control defendant-actors with regard to recognition and proper identification of persons with mental illness, regarding:

(a) Precautions and proper conduct in assisting persons found suffering the effects of mental illness;

b) Damages and reactions caused by unnecessary interference, restraint and use of force to detain persons during an acute mental illness crisis.

228.

The need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights and is the moving force of the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

229.

The Hancock County Sheriff's Office intentionally has a policy of **not** sufficiently addressing mental illness.

230.

Prior to July 14, 2022 Defendant Primus and Hancock County Sheriff's Office developed and maintained policies and procedures or customs exhibiting deliberate indifference to the constitutional and statutory rights of persons within Hancock County.

231.

Without limitation, these customs or policies included (1) having its officers use excessive force, and (2) a failure to adequately discipline, train, or otherwise direct its Sheriff's officers concerning the proper standards for use of force, including, but not limited to, the standards for use of force in encounters with peoples with mental illness and or disability such as schizophrenia.

232.

Defendant Primus and all state actors should have known that mental illness and or disability such as schizophrenia patients should not be restrained and or handcuffed, dropped on the ground, threatened with Tasering, smashed head first into car door frames, and or ejected out of moving vehicles.

233.

And / or, despite their knowledge, training, and warnings about dealing with people who have mental illness and disability such as schizophrenia, the individual state actors, were deliberately indifferent to Ms. Grier's condition and her constitutional rights.

234.

The above-described policies or lack thereof, patterns, practices, training, and custom demonstrate a deliberate indifference on the part of Hancock County Sheriff's Office, Sheriff Primus and their policy makers and its state actors to the constitutional and statutory rights of persons, including people with disabilities, and directly caused the violations of Brianna Grier's rights as alleged herein.

235.

The Office of the Sheriff is charged with enacting and enforcing policies, procedures, protocols, and customs to ensure its officers are properly trained to carry out their duties. The Sheriff failed in this regard by enacting policies, whether written or unwritten, that demonstrate deliberate indifference to Plaintiff, thereby causing the herein complained of harm suffered by Plaintiff, including one or more of the following failures:

a.  Not properly training officers on the use and dangers of excessive force;

b. Training and/or allowing officers to use excessive force on people who are

simply being non-complaint even if the person poses no physical threat;

c. Training and/or allowing officers to engage in citizen interactions and uses of

force without first activating their body-cams;

d. Encouraging officers to act improperly without their body-cams being

on specifically by failing to discipline those officers who fail to activate

their body-cams;

e. Training and/or encouraging and/or allowing officers to cover for each

other instead of advising a supervisor of improper or unlawful conduct, thereby

encouraging officers to act unlawfully and improperly even when other officers are

present; and

f. Having wholly inadequate disciplinary processes in place.

236.

Defendants thereby demonstrated deliberate indifference to Plaintiff's

constitutional rights, as complained of herein, and the harm suffered is a direct

result of this deliberate indifference and was foreseeable.

237.

All herein complained of actions of the Defendants were done recklessly,

intentionally, maliciously, grossly negligently, wantonly, knowingly, and with

deliberate indifference, and in a manner that shocks the conscience, and were

objectively unreasonable.

**THE ABOVE UNCONSTITUIONAL CUSTOMS, POLICIES, AND PRACTICES RESULTED IN BRIANNA GRIER'S INJURIES AND DEATH**

**Count XIII. - Violation of the Americans with Disabilities Act (ADA) and §504 Rehabilitation Act**

238.

Plaintiffs re-allege all of the above paragraphs as if fully set forth herein.

239.

The Defendants are local governmental entities which are recipients of federal funds.

240.

Section 504 requires recipients of federal funds to reasonably accommodate persons with disabilities in their program activities and services.

241.

Section 504 requires such recipients to modify such facilities, services, and programs as necessary to accomplish this purpose.

242.

At all times relevant hereto, Plaintiff was suffering from multiple personality disorder and or schizophrenia.  Ms. Grier was a qualified individual with a disability under §504 and ADA.

243.

Defendant Sheriff PRIMUS and the Hancock County Sheriff's Office must comply with §504 and the ADA.

244.

Defendants employed by Hancock County Sheriff's Office and were acting within the course and scope of employment and under color of law.

245.

At all times relevant hereto, Ms. Grier was exhibiting erratic behaviors that were consistent with suffering a mental health crisis.  Furthermore, all state actors knew or should have known they were responding to a mental health crisis.

246.

As a punishment for Ms. Grier's erratic, uncooperative and/or irrational behaviors (i.e., the effects of her disability), Defendants utilized pain techniques in place of appropriate care, excluding, denying, and/or discriminating against Grier by reason of Grier's recognized disability.

247.

Instead of accommodating Ms. Grier's needs, Defendants failed to accommodate Ms. Grier's disabilities and were intentionally and/or deliberately indifferent to her and other similarly situated person's rights under § 504 and Title II of the ADA and such was the proximate cause of her injury.

248.

Defendants also failed to train, supervise and discipline officers to comply

with the ADA, an obvious need, failure of which resulted in violations of the ADA.

## STATE LAW CLAIMS

### Count XIV. Negligence & Gross Negligence
### (Individual, Supervisory, Respondeat Superior)

249.

In the alternative, Plaintiffs are entitled to relief against Defendants

for their negligence and or gross negligence in relation to the wrongful acts

describe above.

250.

Hancock County Sheriffs and the individual state actors owed Grier a duty

of care to operate their motor vehicle properly in a safe and non-negligent fashion

and use ordinary care in operating a motor vehicle which includes seat-belting

passengers and properly closing doors; Defendants also owed a duty to avoid

unnecessary physical harm and distress to persons through their use of force in

carrying out the caretaker function.  Defendants breached these duties and

breached their duties to carry out proper training, supervision, discipline, and

retention of its officers.

251.

The conduct of the state actors was within the scope of behavior subject to respondeat superior under Georgia law.

252.

The negligent actions and conduct include but are not limited to failing to properly respond and render medical aid, failure to properly heed and observe the Decedent as a person with multiple personality disorder and or schizophrenia, failure to take note and properly heed the information provided to them by Decedent herself and Decedent's family members, failure to take note and properly heed the information provided by the 911 dispatcher, failure to take note and properly heed the information provided by the sheriff's radio operator, failing to render proper, reasonable, timely aid to the Decedent, failure to render and heed universally accepted procedures and protocols for responding to a mental health crisis, failing to properly apply generally accepted and recognized reasonable aid to a mental health crisis, causing, creating, agitating, and exacerbating the Decedent's medical problem by restraining, handcuffing, threatening, and using unreasonable unnecessary force leading to catastrophic and untimely death, failing to properly supervise and retain state actors, failing to protect Decedent's head upon entry to the patrol car, failing to safely utilize a patrol car and its safety mechanisms including seat-belts, instrument panels, door alarms, and doors.

253.

The conduct of the state actors was extreme and outrageous.

254.

Defendants were negligent in hiring, supervising, condoning, and / or training and / or retaining state actors involved herein.

255.

These wrongful acts were the proximate cause of injuries further described above.

## Count XV. Common Law Assault & Battery
## (Individuals and Respondeat Superior)

256.

Plaintiff incorporates herein all previous allegations.

257.

Georgia law protects individuals from bodily invasions such as assault and battery. See O.G.C.A. § 51-1-13, § 51-1-14.

258.

Defendant intended to cause and did cause Plaintiff to suffer apprehension of immediate harm and severe injury as described above.

259.

Lieutenant PRIMUS intentionally utilized his Taser as an extension of his body to threaten to inflict an offensive, unwanted and harmful touching onto Plaintiff.

260.

At no time did Plaintiff consent to the harmful and offensive touching and force from Defendant.

261.

Lieutenant PRIMUS and Deputy LEGETTE intended to make contact with Brianna Grier, and then dropped her twice on her head and neck.  Subsequently Lieutenant PRIMUS slammed Grier's head into Deputy LEGETTE's patrol car door frame.  Deputy LEGETTE then proceeded to give Grier a "Rough Ride".

262.

Throughout the encounter, Defendants acted willfully, with malice, in bad faith, without any lawful basis, and with intent to cause injury to Grier.

263.

Grier was seriously injured by Defendants.

264.

Defendants placed Brianna Grier in immediate fear of death and severe bodily harm by battering her without any just provocation or cause.

265.

Defendants inflicted harmful and offensive, unprivileged and unconsented contact upon Grier with the intent to cause such contact.

266.

The conduct of the Defendants, as described herein, intentionally caused an unauthorized harmful or offensive contact to Grier's person.

267.

Hancock County Sheriff's Office is liable as a principal for all torts committed by its employees within the course and scope of their employment, described herein, via respondeat superior.

268.

As a proximate result of the actions and omissions discussed in this count, Grier was injured, endured physical pain and mental suffering, experienced mental anguish and emotional distress and died from these injuries.

### Count XVI - False Imprisonment
### (Individual State Actors and Respondeat Superior)

269.

Plaintiffs incorporate herein all previous allegations

270.

Brianna Grier was unlawfully restrained against her will.

271.

There was no probable cause to restrain Brianna Grier in the manner in which she was restrained.  Brianna Grier needed mental health treatment and care.

## Count XVII. Intentional Infliction of Emotional Distress
## (Individual State Actors and Respondeat Superior)

272.

Plaintiffs incorporate herein all previous allegations

273.

The state actors created a medical emergency for Ms. Grier while in their custody and control.

274.

Defendants' actions in falsely arresting Grier, handcuffing her, throwing Ms. Grier to the ground multiple times, ignoring her cries for help, restricting her freedom of movement, threatening and intimidating her with a Taser device, slamming her head into the door frame, giving her a "rough ride" and ejecting her out of the moving vehicle were outrageous and intolerable in a civilized society.

275.

Defendants, individually and in concert, engaged in outrageous conduct recklessly and or with the intent of causing Ms. Grier severe pain and emotional distress.

276.

Defendants' outrageous actions and or omissions were the actual and proximate cause of Brianna Grier's emotional distress.

277.

Defendants acted willfully and wantonly, inter alia, because, upon information and belief, they assumed that Ms. Grier was under the influence of some sort of "street drug" and was therefore somehow morally deserving of rough treatment, Defendants ignored Decedent's cries for help and obvious signs that Defendants were hurting Decedent, employed handcuffs, restraint tactics and frightened Decedent with conducted electric energy weapon (Taser device) that they have or reasonably should have been trained and known not to employ when dealing with persons experiencing mental health crises.

278.

These wrongful acts were the proximate cause of injuries further described above.

279.

Based on the willful, outrageous and malicious conduct of Defendants, Plaintiff is entitled to punitive damages.

280.

A person is subject to liability to the other for physical harm resulting from the failure to exercise reasonable care "when a person undertakes either gratuitously or for consideration to render services to another, which he should recognize as necessary for the protection of the other's person or things."

281.

Hancock County Sheriff's Office and its Officers undertook to respond to a 911 call for mental health assistance, breached their duty to render appropriate care to Ms. Grier, a person needing their services, and such breach of duty was a direct cause of the harm that occurred to Ms. Grier.

282.

Defendant Hancock County Sheriff PRIMUS and his agents and employees breached their duty to Ms. Grier by failing to exercise reasonable care in training its employees about how to respond to and assist persons experiencing an acute mental health crisis.  The conduct of the Defendant Officers, as described herein, intentionally and wrongfully restrained Ms. Grier's freedom of movement and liberty, without consent, and Grier suffered distress and was damaged as a result.

283.

As a direct and proximate result of Hancock County Sheriff's Office's failure, Ms. Grier suffered physical and emotional injuries, and wrongful death.

## Count XVIII. - Defamation / Slander / Fraud / Intentional Misrepresentation (Individual State Actors and Respondeat Superior)

284.

Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein and state that the above paragraphs also apply to subsequent paragraphs, causes, and counts.

285.

Defendants intentionally made multiple false statements knowing they were untrue about Brianna Grier, and these statements were made to third persons with the intention to deceive, mislead, and cause harm to Grier and Grier's reputation, and the reputations of Grier's family members, Plaintiffs herein.

286.

Plaintiffs have claims for fraud and deceit pursuant to, among others for example, O.C.G.A. § 51-6-2.

287.

Defamation is an invasion of the interest in reputation.  Defendants made efforts to intentionally publicize a statement which is false, unprivileged, and has a natural tendency to injure or which causes special damage.

288.

These false statements about Brianna Grier were communicated by the Defendants to a third party.

289.

These false accusations of Defendants were intentional and knowingly false and fraudulent.

290.

As a result of the false, fraudulent statements by Defendants, Brianna Grier, Marvin Grier, Mary Grier, and Brianna's daughters suffered harm.

291.

The statements made by the Defendants are so egregious and are automatically considered defamatory and defamatory per se because they involve false charges against another person with a crime punishable by law. See Ga. Code Ann. §51-5-4. Georgia courts have interpreted defamation per se to include statements that one is guilty of a crime, dishonesty or immorality.   As stated above, the assertions, statements, and charges concocted by Defendants are false and outrageous.

## Count XIX. - Vicarious / Respondeat Superior Liability

292.

Plaintiffs incorporate and reallege all allegations as if set forth fully verbatim herein.

293.

In Georgia, employers / principals are vicariously liable for damages arising from the acts or omissions of their employees or agents when such tortious conduct

is committed in the course of the employer's or principal's business, within the scope of the servant's or agent's employment and is sufficient to authorize a recovery of punitive damages under OCGA § 51-12-5.1.

294.

OCGA § 51-2-2 provides: "Every person shall be liable for torts committed by his wife, his child, or his servant by his command or in the prosecution and within the scope of his business, whether the same are committed by negligence or voluntarily."

295.

The torts alleged herein were committed in the course and prosecution of the employer / masters' business and within the scope of the servants' / agents' employment and also for purposes of accomplishing the ends of the employment.

## Count XX. - Wrongful Death

296.

Plaintiff re-alleges and incorporates by reference each of the allegations and numbered paragraphs set forth above as if fully set forth herein.

297.

Brianna Grier died on July 21, 2022 as a direct and proximate result of the intentional, wanton, and or negligent acts and omissions of the Defendants as described in this Complaint, individually and/or jointly.

298.

Plaintiff seeks the full value of the life of Brianna Grier under Georgia's wrongful death statutes due to the intentional, wanton, and or negligent actions and omissions of all Defendants.

## Count XXI. - State Tort Law Estate's Claim for Survival Injury

299.

Plaintiff re-alleges and incorporates by reference each of the allegations and numbered paragraphs set forth above as if fully set forth herein.

300.

As set out above, Ms. Grier sustained suffering as a direct result of Defendants' acts and omissions which constitute violations of federal and state law.

301.

In her capacity as the Administrator of Ms. Grier's Estate, Plaintiff is entitled to recover all damages to which Ms. Grier would have been entitled had she survived.  As a result of the Defendants' wrongful conduct, Ms. Grier incurred medical and related expenses for her care, treatment and services prior to her death, and final expenses.  Ms. Grier also endured pain and suffering and was emotionally affected as a result of Defendants' acts and omissions prior to her death.

302.

Based on the foregoing, Plaintiff as the Administrator of her late daughter's Estate is entitled to recover from Defendants damages equal to all expenses incurred in the provision of medical care and treatment to Ms. Grier resulting from the Defendants' wrongful conduct and to recover for Ms. Grier's final expenses. This Plaintiff is also entitled to recover damages for Ms. Grier's conscious pain and suffering prior to her death.

303.

Individually and jointly, Defendants recklessly, wantonly, consciously and or deliberately disregarded the risk that their actions posed to Ms. Grier. As a direct and proximate result of Defendants' conduct, Plaintiffs suffered, *inter alia*, substantial pain, suffering, discomfort, lost wages, and wrongful death.

304.

Plaintiffs are entitled to recover those claims that Brianna Grier would have had had she survived and Plaintiffs seek to recover the full value of the life of Brianna Grier in both economic and non-economic damages, to be shown by the evidence presented.

## Count XXII. - Punitive Damages

### 305.

Plaintiffs re-allege and incorporate by reference each of the allegations and numbered paragraphs set forth above as if fully set forth herein.

### 306.

Defendants' actions showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiffs to recover punitive damages against the Defendants in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter Defendants from repeating their conduct.

### 307.

Defendants acted with the specific intent to cause harm in that Defendants desired to cause the consequences of their actions and/or knew that the consequences of their actions were substantially certain to result.

### 308.

Plaintiffs incorporate all other paragraphs of this Complaint for purposes of this claim to show Defendants recklessly, consciously and deliberately disregarded the risk that their actions posed to Ms. Grier.  As a direct and proximate result of

Defendants' conduct, Plaintiffs suffered, *inter alia*, substantial pain, suffering, discomfort, lost wages, and wrongful death.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for damages and request the Court:

a. Allow a trial by jury on all issues so triable;

b. Award Plaintiffs compensatory and punitive damages against all Defendants;

c. Grant costs of this action, interest, and attorneys' fees per 42 U.S.C. § 1988;

d. Award further relief as the Court deems equitable, proper, and just.

Respectfully submitted this 23rd day of May, 2023

**ERIC J. HERTZ, PC**

*/s/ Eric J. Hertz*
Eric J. Hertz
Georgia Bar Number 349501
*hertz@hertz-law.com*
Jeffrey E. Gewirtz
GA State Bar No. 292434
*jeff@hertz-law.com*
8300 Dunwoody Pl. Suite 210
Atlanta, GA 30350
Phone: (404) 577-8111
Fax: (404) 577-8116

*Counsel for Plaintiffs*

## TABLE OF CLAIMS

### Federal Claims

Count I – General 42 U.S.C. 1983 Claims – against all Defendants

Count II – State Created Danger / Special Relationship 42 U.S.C. 1983 Claims

Count III - 42 U.S.C. 1983 - EXCESSIVE FORCE

Count IV - Violation of the Fourth Amendment, Deliberate Indifference
To Substantial Risk of Injury Against State Actors

Count V - Violation of Fourth Amendment, Deliberate Indifference to
Medical / Psychological Need Against State Actors

Count VI - Violation of Eighth Amendment, Cruel & Unusual Punishment

Count VII - Monell / Municipal Claims Against Office of the Sheriff & Sheriff
Primus for Violation of Fourth Amendment, Deliberate Indifference to Substantial
Risk of Injury from Unsafe Transport Custom that is Pervasive, Long-Standing
Practice

Count VIII - Violation of the Fourth Amendment, Municipal Liability
Under Monell Arising from the Defendant Sheriff's Office Deliberate Indifference
and Failure to Discipline Officers Who Use Excessive Force – Even When
Unlawful Use of Force is Captured on Video and GBI Proves Officers and Sheriff
Falsified Reports and Misrepresented Details

Count IX - Violation of the Fourth Amendment, Municipal Liability
Custom / Pattern / Practice / Policy of Trumping Up Obstruction Charges
Monell Liability Brought pursuant to 42. U.S.C. 1983,
Against State Entities and Supervisors

Count X - Violation of the Fourth Amendment, Municipal/Monell Liability
Custom and Policy of Allowing Officers to Selectively Utilize Body Cameras
Brought pursuant to 42. U.S.C. 1983, Against State Entities and Supervisors

Count XI – Canton Liability for Inadequate Training / Supervision / Discipline
Violations of the Fourth Amendment, Deliberate Indifference To Medical /

Psychological Need and Failure to Train / Supervise / Discipline / or Otherwise Maintain Policy Against State Entities, Supervisors

Count XII - Supervisory Liability Against Sheriff Primus and Lt. Primus

Count XIII - Violation of the Americans with Disabilities Act (ADA) and §504 Rehabilitation Act

## State Claims

Count XIV - Negligence & Gross Negligence

Count XV - Common Law Assault & Battery

Count XVI - False Imprisonment

Count XVII - Intentional Infliction of Emotional Distress

Count XVIII - Defamation / Slander / Fraud / Intentional Misrepresentation

Count XIX - Vicarious / Respondeat Superior Liability

Count XX - Wrongful Death

Count XXI - State Tort Law Estate's Claim for Survival Injury

Count XXII - Punitive Damages

cc:  BEN CRUMP

Exhibit A

## IN THE PROBATE COURT OF <u>HANCOCK</u> COUNTY
## STATE OF GEORGIA

IN RE: ESTATE OF           )

                              )

<u>BRIANNA MARIE GRIER</u> ,     )     **ESTATE NO. <u>E-23-166</u>**

**DECEASED**             )

### LETTERS OF ADMINISTRATION
*[Bond waived and/or certain powers granted]*

At a regular term of probate court, this Court granted an order allowing <u>MARY GRIER</u> to qualify as administrator(s) of the above-named decedent, who was domiciled in this county at the time of his or her death or was domiciled in another state but owned property in this county at the time of his or her death, and that upon so doing, letters of administration be issued to such personal representative(s).

THEREFORE, the said administrator(s), having taken the oath of office and complied with all necessary prerequisites of the law, is/are legally authorized to discharge all the duties and exercise all powers of personal representative(s), according to Georgia law.  In addition this Court: *Administrator shall post a corresponding bond determined by the Court as soon as assets are added to the Estate.*

*[Initial all that apply]*

*SmL*   (a)   ***POWERS GRANTED:*** Grants to the administrator(s) all of the powers contained in O.C.G.A. § 53-12-261, except the administrator(s) shall not be authorized to bind the estate by any warranty in any conveyance or contract in violation of O.C.G.A. § 53-8-14 (a).

*SmL*   (b)   ***REPORTS WAIVED:*** Grants to the administrator(s) the specific power to serve without making and filing inventory, and without filing any annual or other returns or reports to any court.

*SmL*   (c)   ***BOND TEMPORARILY WAIVED:*** Temporarily waives the specific requirement to post bond.

*SmL*   (d)   ***STATEMENTS WAIVED:*** Grants to the administrator(s) the specific power to serve without furnishing to the heirs statements of receipts and disbursements.

IN TESTIMONY WHEREOF, I have hereunto affixed my signature as judge of the probate court of said county and the seal of this office this 11th day of _April_, 20 **23** .

_Sabrina Lamar_
Judge of the Probate Court

*The following must be signed if the judge*
*does not sign the original of this document:*

Issued by:                              *[Seal]*

_____

Clerk of the Probate Court

⬥ EFILED IN OFFICE
CLERK OF SUPERIOR COURT
HANCOCK COUNTY, GEORGIA

**SUCV2022000060**
M
**DEC 15, 2022 02:05 PM**

LeShauna Jackson, Clerk
Hancock County, Georgia

IN THE SUPERIOR COURT OF HANCOCK COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| **RODNEY REID,** | * | |
| Plaintiff, | * | |
| VS. | * | **CIVIL ACTION NO.: SUCV2022000060** |
| **BRIANA GRIER (Deceased),** | * | |
| Defendant, | * | |
| VS. | * | |
| **MARY GRIER and MARVIN GRIER.** | * | |
| Intervenors. | * | |

## ORDER APPOINTING GUARDIAN AD LITEM

The above and foregoing matter is pending in this Court and the Court having determined that the interests of the minor children may require appointment of a Guardian ad Litem. Both parties having requested and agreed to such appointment at a hearing held on December 7, 2022.

Good cause appearing IT IS ORDERED that pursuant to Rule 24.9 of the Uniform Superior Court Rules, HOGANNE HARRISON-WALTON, a practicing attorney familiar with the role, duties, and responsibilities of the role, is hereby appointed Guardian ad Litem to protect the interest and concerns of the minor children involved in this matter, to wit; **Maria Malina Grier, YOB: 2018, and Mariah Selene Grier, YOB: 2018**, until final disposition of the case or unless sooner discharged by this Court.

IT IS ALSO ORDERED that said Guardian ad Litem (hereafter "GAL") shall received $150.00 per hour for services rendered. The initial $1,500.00 retainer to be applied towards the GAL fees shall be paid as follows: $750.00 by Plaintiff and $750.00 by the Intervenors for deposit into the GAL's escrow account for the payment of GAL fees within fourteen (14) days of this Order. All payments are to be made directly to Hoganne Harrison-Walton at The Hogan Law Firm LLC, 108 Fieldstone Drive, Milledgeville, Georgia 31061. Once the initial retainer has been depleted, it shall be replenished by the parties upon request, with each party paying for one half (1/2) of the GAL's fees

throughout the pendency of this action. The Court may reapportion the GAL fees at the conclusion of this matter if the Court deems it necessary or appropriate.

IT IS FURTHER ORDERED that the appointed Guardian ad Litem shall:

1. Be allowed access to the children by the caretaker, whether that caretaker be individuals, authorized agencies, educational facilities, or health care providers.

2. Have, upon presentation of this Order to any agency, hospital, organization, school, individual or office, including but not limited to the Clerk of Superior Court, Clerk of Juvenile Court, human services and/or child-caring agencies, public or private institutions and/or facilities, medical and mental health professionals, law enforcement agencies and the Attorney General, the authority to obtain information whether verbal or written and to inspect and receive copies of any records or notes, and to inspect and receive copies of any recordings concerning the children that are relevant to the proceedings filed without the consent of the child, custodian, or agencies having control of the child or children.

3. Hold any information obtained from this Order or during investigation of this matter as confidential and shall not disclose the same except to the Court and where allowed by the Court, to other parties to this case and where provided by law.

4. Have the right to examine any residence wherein any person seeking custody or visitation rights proposes to house the minor child or children. The GAL may request the Court to order examination of the child, parents, or anyone seeking custody of the child, by medical or mental health professional, if appropriate. The GAL shall be entitled to notice of, and shall be entitled to participate in all hearings, trials, and investigations, depositions, settlement negotiations, or other proceedings concerning or affecting the child or children.

5. File, where appropriate, motions and pleadings that the GAL determines necessary to preserve, promote, or protect the best interest of the child or children in question. The GAL specifically possesses the right to make discovery demands and request subpoenas for documents or individuals. Upon filing of any such motions or pleadings, the GAL shall promptly serve all parties with copies of such filing.

6. Communicate, where appropriate, with counsel for either or both parties with or without including the other counsel in the same conversation, meeting, or communication.

7. Not have ex parte communications with the court, except in matters of emergency concerning the child's welfare or upon consent of the parties or counsel. The GAL may request an immediate hearing to address emergency concerns, which will trigger immediate notice to counsel concerning the nature and scheduling of the emergency hearing.

8. Be available to testify as the Court's witness at trial unless otherwise directed by this Court. The GAL shall be subject to examination by the parties and the Court. The GAL is qualified as an expert witness on the best interest of the child or children in questions. The GAL may testify as to the information and foundation provided by witness and source and the results of the GAL's investigation, including, but not limited to recommendations as to what is in the best interest of the child or children at issue. The GAL shall not be allowed to question witness or present argument, absent exceptional circumstances and upon express approval of the Court.

9. Submit to this Court a written report detailing findings and recommendations. Unless otherwise ordered by this Court, that report shall be distributed to the parties or their counsel and shall be admitted into evidence at trial and may be used by the parties for any evidentiary purposes permitted by law. The written report, including recommendations, may be used by this Court in making decisions in this case. The GAL shall attend and provide testimony at trial, unless excused by this Court. The written report of the GAL shall:

   a. Summarize the GAL's investigation, including identifying all sources contacted or relied upon in preparing the report. The GAL shall offer recommendations concerning child custody, visitation, and child-related issues, along with reasons supporting those recommendations.

   b. Be released by counsel (including the staff and experts involved in the matter) and parties only, and shall not be further disseminated without express order of this Court.

   c. Be based upon the file complied by the GAL during the course of the investigation. The contents of that file shall be made available to counsel and parties for review. Should the parties request copies from the file they shall be required to pay the costs of the same.

   d. Be treated as confidential. Any unauthorized dissemination of the GAL's report or its contents by any person having access, shall be subject to sanctions, including a potential finding of contempt by this Court

   e.  Be, at the discretion of the Court, filed with the Clerk of Superior Court. If so, it
       shall be filed under seal to preserve the security, privacy, and best interest of the
       child or children at issue.

IT IS FURTHER ORDERED that the parties and their Counsel shall:

1. Communicated with the GAL productively and to the extent necessary for the GAL to
   complete necessary inquiry concerning the child or children. It is not required for parties or
   counsel, when communicating with the GAL to notify, include, or copy opposing counsel or
   party about those communications.
2. Notify the GAL of date, time, and location for all mediations, depositions, hearing, trials, or
   other proceedings concerning the child or children in question. Counsel shall promptly serve
   the GAL with proper notice of all legal proceedings wherein the child's interests are involved
   and shall provide the GAL with proper, timely, written notice of all non-court proceedings
   involving the interests of the child or children.
3. Inform the GAL of any agreement reached concerning issues affecting the child or the
   children's interests. The GAL shall have the right and opportunity to make objections to the
   Court of any proposed settlements or agreements related to or affecting the child or children
   prior to the Court approving the agreement.

Upon motion of either party or the Court's own motion, the Court may consider removing the GAL
from this matter for good cause shown. The appointment and the terms of this Order shall be in
effect until further order of this Court.

   SO ORDERED this ___13th___ day of December, 2022.

                                         Stephen A. Bradley
                                         Judge, Hancock County Superior Court
                                         Ocmulgee Judicial Circuit

## CERTIFICATE OF SERVICE

I, Molly Bonner, Secretary to Judge Stephen A. Bradley, do hereby certify that I have this day served the within Order Appointing Guardian Ad Litem upon the individuals listed below by electronic transmission or by mailing a copy to them by U.S. Mail in envelopes having sufficient postage thereon to ensure delivery and addressed as follows:

LaToya A. Hutchinson, Esq.
Attorney for Petitioner
lah@hutchinsonlawoffices.com

Kerry A. Allen, Esq.
Attorney for Marvin and Mary Grier
kerry@cansinolaw.com

Hoganne A. Harrison-Walton, Esq.
Guardian-Ad-Litem
hoganne@hoganlawfirmga.com

Original e-filed with Clerk of Court

This 15th day of December, 2022.

Molly L. Bonner
Post Office Box 111
Monticello, Georgia 31064
Tel: (706) 468-4906